IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM CORY GANN,

 Plaintiff,

v.           No. CIV 11-191 GBW/ACT

SHAWN SCOTT,

 Defendant.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

 THIS MATTER is before the Court on Defendant's Motion for Partial Summary Judgment.  *Doc. 17*.  Defendant Scott, a sergeant in the Farmington Police Department, argues that he is entitled to qualified immunity on Plaintiff Gann's claims.  *Id.* at 2.

 In an encounter which took place on the morning of Friday, February 27, 2009, Defendant fired his assault rifle at Plaintiff twelve times (*see* Doc. 17, Ex. A at 9:50:10- 9:51:15)[1], striking him with nine of the twelve shots (*doc. 28* at 22).  Plaintiff brings his claim pursuant to 42 U.S.C. § 1983, asserting that Defendant violated his right to be free from the unreasonable seizure of his person as guaranteed by the Fourth Amendment to the U.S. Constitution.  *Doc. 1* at 1.  Plaintiff argues that the Defendant's use of deadly

---

[1] *Doc. 17*, Ex. A is a "dashcam" video.  It is a recording of the events in question taken from the point of view of Defendant's dashboard.  The times indicated in the citation indicate the times of day.  There is a second dashcam video, *doc. 17*, Ex. D.  This is the dashcam video from Nielsen's car.  It shows more or less the same things as the dashcam video from

force made the seizure unreasonable for Fourth Amendment purposes.

The Court concludes that, as a matter of law, Defendant's use of deadly force when he fired twelve shots at Plaintiff was objectively reasonable from the point of view of an officer in Defendant's position.  Therefore, Defendant's motion for qualified immunity will be granted.

## I.      UNDISPUTED FACTS

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a] fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . .  citing to particular parts of materials in the record, including . . .  affidavits." Fed. R. Civ. P. 56(c)(1)(A).  "The evidence of a non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986).

However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

---

Defendant's car.

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).  For example, where a video recording of the relevant event exists and there is no allegation that the recording was doctored or altered in any way, the facts as clearly demonstrated in the recording should be considered undisputed facts.  *Id*.

As an initial matter, the Court will outline the contents of the record.  Defendant relies upon the following sources: (1) affidavit of Sergeant Shawn Scott, the Defendant (*doc. 17*, Ex. B); (2) affidavit of Officer Soren Nielsen (*id.*, Ex. E); (3) affidavit of Kevin Jones (*id*, Ex. C); (4) affidavit of Matthew Moon (*id.*, Ex. F); (5) affidavit of Investigator Jennifer Swilling; (6) dashcam video of the incident from Officer Scott's patrol car (*id.*, Ex. A); (7) dashcam video of the incident from Officer Nielsen's patrol car (*id.*, Ex. D); (8) map of City of Farmington (*doc. 17*, Ex. I); (9) affidavit of Plaintiff attached to Response (*id.*, Ex. A); and (10) the Complaint.[2]  *Doc. 1.*  The videos are in color and include audio as well as video.  Their quality is moderately good, but some important things cannot be seen clearly, and some of the recorded dialogue is indistinct.  The authenticity of the video recordings is not in dispute, although the parties dispute what they show and whether they blatantly contradict the facts asserted by the parties.  The

_____

[2]   The factual assertions in the Complaint can be used by Defendant because they constitute judicial admissions of Plaintiff.  *See Rooms v. S.E.C.*, 444 F.3d 1208, 1213 (10th Cir. 2006).  However, those assertions cannot be relied upon by Plaintiff because the Complaint was not signed by him under penalty of perjury, and is therefore not properly verified.  *See Hilton v. Zavaras*, 72 F.3d 137 (10th Cir. 1995) (unpublished) (*citing Hall v. Bellmon*, 935 F.2d 1106, 1111

particular disputes will be discussed below.

1.  Defendant is an officer with the Farmington Police Department.  *Doc.* 17, Ex. B at 1.  On Friday, February 27, 2009, he was on duty patrolling Farmington in his patrol car.  *Id.*, Ex. B at ¶¶ 4-5.

2.  At 9:44 a.m. on the morning of February 27, 2009, the FPD dispatch received a radio call from Farmington Emergency Medical Services ("EMS") requesting that an officer perform a welfare check on the occupant of a vehicle.  *Id.*, Ex. A at 09:44:59; *see also*, *Id.*, Ex. C at ¶¶ 7-15 (explaining how EMS paramedic supervisor Jones encountered the vehicle and what he reported to FPD).  An EMS paramedic had observed the occupant sleeping in a vehicle parked facing the wrong direction for more than a hour. *Id*.  The EMS paramedic advised dispatch that the occupant was armed and unconscious.  *Id*.

3.  At the time Defendant received the call, he was approximately a block away from the vehicle and was driving on a busy road in Farmington.  In the two minutes shown on the videotape during which Defendant was driving on that road, more than 60 vehicles are seen driving on this road.  *Id.*, Ex. A at 9:43:35-9:45:36.

4.  At the time, FPD had no reason to suspect that Plaintiff was involved in a crime.  *See doc. 1* at ¶ 12; see also, *doc. 17*, Ex. B at ¶ 27 (noting that Defendant was

_____

(10th Cir. 1991)).

investigating a traffic [parking] violation at that point and "a suspicious situation (not necessarily criminal) involving a person who may be suicidal.").

5.   FPD dispatch reported that the suspect vehicle was parked at 631 Animas Street near the intersection with Schwartz Avenue.[3]  *See doc.  1 at ¶ 10; doc. 17, Ex. B at ¶ 5.*

6.   FPD dispatch advised further that the occupant was a male subject who was passed out behind the wheel of a blue Chevrolet 4-door passenger car with a gun in his lap and that EMS medic 1 had visual contact.[4]  *See id.*, Ex. A at 09:43:54; *see also doc. 1* at ¶ 10.

7.   When Defendant arrived on the scene, he observed that the Chevrolet was parked illegally. The vehicle was in the eastbound lane of traffic on Animas Street but it was facing west in the direction of oncoming traffic.[5]  *See doc. 17*, Ex. A at 09:44:58; *id.,* Ex. B at ¶ 9.

8.   The sole occupant of the vehicle was Plaintiff.  *See doc. 1* at ¶¶ 9-11.

---

[3]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Doc. 28*, Ex. A at ¶ 4. However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id*.

[4]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id*. at ¶ 5.  However, he states only that he was not in possession of a gun.  *Id*.  This assertion, however, does not dispute the fact described here which deals with what the officer was told.  Nowhere in his Response does Plaintiff point to evidence which renders the contents of this dispatch in dispute.

[5]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id*. at ¶ 6.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id*.

9.  Defendant was dressed in full police uniform and was driving a fully marked FPD police vehicle at the time.  *See doc. 17*, Ex. B at ¶ 4.

10.  Defendant parked his vehicle approximately fifteen (15) feet behind the Chevrolet.  *See id.*, Ex. B at ¶ 10.

11.  From this position, Defendant's dashcam had a full view of the rear of the Chevrolet, a view of the intersection of Schwartz Avenue and Animas and a view that extended several blocks west on Animas, where EMS's ambulance center is located, and a partial view of the area at the southwest corner of Schwartz Avenue and Cedar Street. *See, e.g.*, *id.*, Ex. A at 09:44:58.

12.  As Defendant parked his vehicle, he turned on the vehicle's overhead emergency lights and sounded the vehicle's siren once to alert the occupant of the Chevrolet to his presence.[6]  *Id*; *see also*, *id.*,, Ex. A at 9:45:57 - 9:45:58 (recording activation of Defendant's alarm as he parks his vehicle and showing reflection of overhead emergency lights from patrol car on Chevrolet); *id.*, Ex. C at 3, ¶ 20 (noting that the emergency light bar of the FPD Expedition vehicle illuminated as a uniformed officer stepped out of the vehicle).

13.  Defendant did not approach the Chevrolet.  Instead, he positioned himself behind the driver's side door of his vehicle, drew his sidearm out, and trained it on the

---

[6]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 10.  However, the dashcam video clearly establishes this fact.

Chevrolet, following the protective procedures that police are taught to employ during felony stops.[7]  *See id.*, Ex. B at ¶ 11.

14.  An EMS paramedic vehicle had taken up a position two blocks west of the intersection of Animas and Schwartz, blocking traffic from entering the eastbound lane of Animas where the Chevrolet was parked.[8]  *See id.*, Ex. A at 09:45:53 (showing an EMS Suburban parked sideways, approximately two blocks west of where Plaintiff's vehicle was parked).

15.  Although the rear window of the Chevrolet was tinted, nevertheless, Defendant could detect movement through the rear window, which told him the occupant was no longer unconscious.  *See id.*, Ex. B at ¶ 12.

16.  The driver's side window was rolled down approximately 6-8 inches. *See id.*, Ex. C at 2, ¶ 10.

17.  Defendant called out to the occupant of the Chevrolet, "Driver, show me both hands out that window, right now."[9]  *See id.*, Ex. A at 09:46:02.

---

[7]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 11.  Plaintiff's However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[8]  In his affidavit, Plaintiff indicates that he partially disputes this fact.  *Id.* at ¶ 12.  It is unclear what part Plaintiff disputes.  Nonetheless, the dashcam video clearly establishes this fact.

[9]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 15.  However, his "dispute" does not challenge the fact that the officer made this statement.  Nowhere in his Response does Plaintiff point to evidence which render this fact in dispute.  Moreover, the dashcam video clearly establishes this fact.

18.  Defendant repeated his command several seconds later, telling the occupant, Plaintiff, that he wanted to see "both hands out the window right now."[10]  *See id.*, Ex. A at 09:46:08.

19.  Plaintiff stuck his head out the driver's side window of the Chevrolet and gave a response, but the dashcam videotape recorder in Defendant's patrol car did not capture exactly what Plaintiff said.[11]  *See id.*, Ex. A at 09:46:10.

20.  Defendant repeated his command, telling Plaintiff "Let me see your hands right now." *See id.*, Ex. A at 09:46:15.

21.  Plaintiff appeared to place only his left hand outside the driver's side window of the Chevrolet.  As he did so, the center rear brake light of the Chevrolet illuminated.[12] *See id.*, Ex. A at 09:46:18.

22.  Officer Nielsen arrived on scene and parked his patrol car along the passenger (right) side of Defendant's patrol car.  *See doc. 17*, Ex. D at 09:46:20.

---

[10]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 16.  However, his "dispute" does not challenge the fact that the officer made this statement.  Nowhere in his Response does Plaintiff point to evidence which render this fact in dispute.  Moreover, the dashcam video clearly establishes this fact.  Finally, Plaintiff claims in his affidavit that he "had both hands out the window[]."  However, the dashcam video establishes that, at this point in the encounter, Plaintiff has completely failed to put either hand out the window.

[11]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 17.  However, Plaintiff only seeks to add what he claims he stated at this moment.  *Id.*  He does not further object to this fact.

[12]  In his affidavit, Plaintiff indicates that he disputes the fact as it was presented in Defendant's Motion.  *Id.* at ¶ 19.  Defendant's Motion asserts that Plaintiff only placed one hand out of the window.  *Doc. 17* at 10.  Plaintiff asserts that he had both hands out the window but that "[Defendant] Officer Scott only saw one."  *Doc. 28*, Ex. A at ¶ 16; *id.* at ¶ 19.  Therefore, it is undisputed (and confirmed by the dashcam video) that it appeared that Plaintiff only placed one hand out of the window.

23.  From this position, Officer Nielsen's dashcam was able to capture a view of the right (passenger) side doors and the rear window of the Chevrolet, a foreshortened view of the eastbound lane of Animas down to the location of the EMS ambulance offices, a view into the yard in front of which Plaintiff was parked, and a foreshortened view of the intersection of Schwartz and Cedar Street to the south and west of the location where Plaintiff was parked. *See doc. 17*, Ex. D.

24.  Officer Nielsen was dressed in his blue FPD bike-squad uniform and was driving a fully marked police cruiser.  *See doc. 17*, Ex. E; *see also*, *id.*, Ex. D at 09:46:05 - 09:46:08 (showing Officer Nielsen in his uniform later on during the incident when he approaches the Chevrolet).

25.  Once Officer Nielsen arrived on scene and could provide cover with his sidearm, Defendant switched over from his sidearm to a less lethal beanbag shotgun.[13] *See id.*, Ex. B at 3, ¶ 17; *id.*, Ex. E at 3, ¶ 11.

26.  Defendant continued to command Plaintiff to show him "both hands."[14]  *See id.*, Ex. A at 09:46-20 - 09:46:27; *id.*, Ex. E at ¶ 12.

27.  The center rear brake light of the Chevrolet went off and Plaintiff turned around, leaning his head, neck, and shoulders outside the driver's side window, looked

---

[13]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 23.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[14]  *See supra* n.13

directly at Defendant and asked, "What's wrong, Officer?" *See id.*, Ex. A at 09:46:28; *id.*, Ex. B at ¶ 27; *id.*, Ex. E at ¶ 13.

28.  Defendant answered, stating that "[t]here's a gun in that car. . . put your hands out the door now!" *See id.*, Ex. A at 09:46:30 - 09:46:33.

29.  In response, Plaintiff stuck his head back inside the Chevrolet and appeared to place only one hand outside the window of the driver's side door.  *See id.*, Ex. A at 09:46:30 - 09:46:33.

30.  Defendant repeated his commands "Both of them," and "Put your hands out the door."  *See id.*, Ex. A at 09:46:34 - 09:46:36.

31.  The center rear break light of the Chevrolet illuminated again and Plaintiff retracted his hand.  *Id.* at 09:46:41 - 09:46:42.

32.  Officer Nielsen radioed FPD dispatch to notify them that the Officers were conducting a felony stop and to keep all units off of Schwartz Avenue.[15] *See id.*, Ex. D at 09:46:44.

33.  The center rear brake light of the Chevrolet went out.  *See id.*, Ex. A at 09:46:52.

---

[15]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 22.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

34. Defendant called out to Plaintiff, "Driver, I am not going to warn you again. . . . ," and as he did so, the center rear brake light and the side brake lights of the Chevrolet flickered on and off.[16]  *Id.* at 09:46:56.

35. Defendant repeated "both hands out the door now," and "do it now" several times in quick succession.  *Id.* at 09: 46:58 - 09:47:16.

36. Plaintiff then said something to the officer but it is not clearly audible on the dashcam video.  *Id.* at 09:47:17.

37. Defendant ordered the driver to put the gun down (*id.*, Ex. B at 5, ¶ 37), and repeated his command at least five (5) times over the course of next thirty (30) seconds.[17]  *See id.*, Ex. A at 09:47:19 - 09:47:50.

38. Defendant directed Officer Nielsen to get some stop sticks and place them by the rear tire of the Chevrolet so as to cause the tire to deflate if Plaintiff put the vehicle into reverse or pulled forward.[18]  *See id.*, Ex. A at 09:47:36 (calling for Officer Nielsen to "get the stop stick") and 09:48:02 (telling Officer Nielsen to "get up there and slide it in front of . . . front and back, go."); *id.*, Ex. B at 6, ¶¶ 38-39; *id.*, Ex. E at 3, ¶ 20.

---

[16]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 32.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[17]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 35.  However, upon review of the purported dispute, he does not argue that Officer Scott did not issue these commands.  *Id.*  Moreover, the dashcam video clearly establishes this fact.

[18]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 38.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

39. Officer Nielsen approached the right rear (passenger) side of the Chevrolet and tossed a stop stick in the front of the rear tire and another one behind the rear tire. The Chevrolet's center brake light was illuminated at this point, but the side brake lights were not.[19] *See id.*, Ex. A at 09:48:08; *id.*, Ex. B at ¶ 46; *id.*, Ex. E at ¶¶ 22, 23.

40. As Officer Nielsen placed the stop stick behind the right rear tire of the Chevrolet, the vehicle's side brake lights illuminated, indicating that Plaintiff was attempting to start the vehicle again.[20] *See id.*, Exs. A and D at 09:48:09.

41. After a few seconds, the side brake lights of the Chevrolet went out, but the center brake light remained illuminated.[21] *See id.*, Exs. A and D at 09:48:15.

42. Defendant advised Officer Nielsen that he was going to switch from his beanbag shotgun to his [assault] rifle because "he's got a gun."[22] *See id.*, Ex. A at 09:48:17; Ex. B at ¶¶ 49- 50.

43. Defendant called out to Plaintiff once more, saying, "Driver, open the door."[23] *See id.*, Exs. A and D at 09:48:26; *id.*, Ex. B at ¶ 54.

---

[19] In his affidavit, Plaintiff indicates that he disputes this fact. *Id.* at 9, ¶ 39. However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion. *Id.* Moreover, this fact is clearly established by the dashcam video.

[20] In his affidavit, Plaintiff indicates that he disputes this fact. *Id.* at 9, ¶ 39. However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion. *Id.* Moreover, this fact is clearly established by the dashcam video.

[21] In his affidavit, Plaintiff indicates that he disputes this fact. *Id.* at 10, ¶ 41. However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion. *Id.* Moreover, this fact is clearly established by the dashcam video.

[22] In his affidavit, Plaintiff indicates that he disputes this fact. *Id.* at 10 ¶ 42. However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion. *Id.* Moreover, this fact is clearly established by the dashcam video.

44.  Plaintiff did not comply, although the side brake lights of the Chevrolet illuminated again briefly.[24]  *See id.*, Exs. A and D at 09:48:28; *id.*, Ex. B at ¶ 55.

45.  Defendant had been on the scene for approximately two and a half (2 ½) minutes at this point and, during that time, five (5) different vehicles had passed through the intersection of Animas and Schwartz, which was 25 feet west of the location where Plaintiff was parked. *See id.*, Ex. B at ¶ 59.  *See id.*, Exs. A and D from 09:45:57, showing from time when Defendant arrives on the scene to 09:48:30: (1) a grey pickup heading south on Schwartz at 09:46:06; (2) a dark green minivan heading north on Schwartz at 09:46:40; (3) a white pickup heading south on Schwartz Avenue at 09:46:56; (4) a second white pickup heading south on Schwartz at 09:47:08; and (5) a red four-door sedan headed south on Schwartz at 09:47:30 - 09:47:31.

46.  Defendant determined that he should have FPD take precautions to block all traffic into the area.  *Id.*

47.  Defendant radioed dispatch that "Subject does have a weapon . . . a black handgun. I need Schwartz blocked at Broadway, blocking [southbound] traffic.  I also

---

[23]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 22.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[24]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 44.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

need Schwartz blocked south of Animas, blocking northbound traffic."[25] *See id.*, Ex. A at 09:48:36.

48.   After he radioed dispatch to block all traffic into the area, Defendant tried once again to get Plaintiff's attention, calling out "Driver. . . ."[26] *See id.*, Exs. A and D at 09:48:50.

49.   Music began playing inside Plaintiff's vehicle which would have the effect of drowning out further commands from Defendant.[27]  *See id.*, Ex. A at 09:49:58; *id.*, Ex. B at 5, ¶ 55.

50.   Defendant yelled out "Driver" once more over the music that was emanating from the Chevrolet, but there was no response.[28] *See id.*, Exs. A and D at 09:49:16.

51.   Defendant told Officer Nielsen that he wanted him to approach the Chevrolet again to place another stop stick by the right rear tire to ensure that the tire would make contact with it because the one that he had placed earlier was not close

---

[25]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 48.  However, his dispute does not challenge that Officer Scott radioed this statement.  *Id.*  Moreover, the dashcam video clearly establishes this fact.

[26]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 49.  However, the dashcam video clearly establishes this fact.

[27]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 50.  However, he claims only that he did not intentionally turn on the music to drown out Officer Scott's commands.  *Id.*  He does not dispute that the music turned on or that it would have the effect of drowning out the officer's commands.

[28]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 52.  However, his affidavit does not challenge that Officer Scott issued this command or that music was playing at the time.  *Id.*  Moreover, the dashcam video clearly establishes this fact.

enough to ensure effective contact.[29] *See id.*, Ex. A at 09:49:24 - 09:49:43 (noting, "Soren . . . I want you to go down low. . . go down low, I want you to get that stop stick behind that tire.  You cool with that? Go down the back so . . . we end this real quick if he takes off. . . . The back tire.  Just try to get that . . . in there a little more."); *id.*, Ex. B at ¶¶ 57-58.

52.  Two blocks down Animas Street at EMS's ambulance center, paramedics had been watching the scene unfold from the parking lot.[30]  *Id.*, Ex. C at 3, ¶ 18; *see also*, *id.*, Ex. A at 09:49:17-29; 09:49:52 (showing an EMS ambulance unit parked sideways in the eastbound lane of Animas, blocking traffic, and several paramedics moving around the ambulance).

53.  EMS paramedic supervisor Kevin Jones, who had radioed the original report for a welfare check on Plaintiff, advised his colleague, EMS supervisor Matthew Moon, that he was going to block southbound traffic from entering Schwartz at Broadway, one block north of the scene. Jones asked Moon to have an ambulance unit do the same for northbound traffic entering Schwartz at Cedar, one block south of the scene.[31]  *See id.*, Ex. C at 3, ¶ 25; *id.*, Ex. F.

---

[29]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 53.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[30]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 54.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[31]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 55.  However, upon review of the purported dispute, the fact as described here is not disputed in any material

54.  Matthew Moon jumped into his EMS vehicle, a white Dodge Durango, to respond to the scene after he heard Kevin Jones radio that a group of daycare students were walking north on Schwartz towards the intersection with Animas.[32]  *See id.*, 7, Ex. F at ¶ 7; *id.*, Ex. C at ¶¶ 26-27.

55.  Jones advised that someone should intercept the group before they entered the line of fire.[33]  *See id.*, Ex. C at ¶¶ 26-27.

56.  Matthew Moon headed around the back of the EMS ambulance center to Cedar Street and drove across the intersection with Schwartz to warn the daycare group.[34] *See id.*, Ex. A at 09:49:41 - 09:49:45; *id.*, Ex. D at 09:49:44 - 09:49:50 (showing a white Durango with EMS markings on the door panel of the driver's side door move east down Cedar Street to the intersection with Schwartz).

57.  Moon reached the daycare group just as they were crossing an alley that lies behind the property where Plaintiff was parked.[35] *See id.*, Ex. F at ¶ 9; *id.*, Ex. C at ¶ 28.

---

fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[32]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 56.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[33]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 57.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[34]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 58.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[35]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 59.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

58.   In the meantime, Defendant had been directing Officer Nielsen to place a second stop stick behind the right rear tire of the Chevrolet.  While he was explaining how to place the stop stick, the center brake light to the Chevrolet began to flicker on and off.[36]  *See id.*, Exs. A and D at 09:49:30 - 09:49:57.

59.   A white pickup truck began to approach the intersection of Schwartz and Animas from the south. *See id.*, Ex. A at 09:50:00.  Although Defendant had radioed dispatch a minute and a half before this to block all traffic, vehicles were continuing to make it into the area. The white pickup was the third vehicle to make it onto Schwartz after Defendant first requested that traffic be blocked.  *See id.*, Ex. A at 09:47:44 - 09:50:00 (showing a white sedan heading south on Schwartz at 09:47:44; (2) a maroon-colored jeep convertible headed north on Schwartz at 09:48:49; and (3) a white pickup truck headed north on Schwartz at 09:50:00).

60.   Defendant radioed dispatch once again, advising that "4124, I need those units up there to block traffic."[37] *See id.*, Ex. A at 09:50:04.

61.   Seconds later, as the white pickup truck reached the intersection of Schwartz and Animas and turned west onto Animas, Officer Nielsen began to approach the Chevrolet from the rear, crouching down low.[38]  *See id.*, Exs. A and D at 09:50:06.

---

[36]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 60.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[37]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 64.  However, upon review of the purported dispute, the fact as described here is not disputed in any material

62.   As Officer Nielsen was placing a stop stick behind the right rear tire, Plaintiff's head, arm, and shoulders came into view through the rear window of the Chevrolet.  *Id.*, Ex. A at 9:50:07 – 9:50:10.  Plaintiff's head and arm were silhouetted against the front windshield.  *Id.*  Plaintiff appeared to lift his outstretched right arm from the passenger seat area and turn his body such that his head was looking back out the rear window of the Chevrolet and his right hand moved over the passenger seat into the area above the back seat.  *Id.*  It appeared that Plaintiff was holding something approximately the size of a gun which, if it were a gun, would now be pointing towards the rear passenger side of the vehicle.[39]  *Id.* *

63.   When Defendant saw Plaintiff move his hand in the direction of the rear of the car and point some item at Officer Nielsen, Defendant fired a single round at Plaintiff's outstretched arm.[40]  *See id.*, Exs. A and D at 09:50:10; *id.*, Ex. B at ¶ 66; *id.*, Ex. E at ¶ 31.

---

fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[38]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 65.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[39]   In his affidavit, Plaintiff indicates that he partially disputes this fact.  *Id.* at ¶ 66.  While he does not dispute the description of his movement, he claims that he was only holding a breathalyzer and not a gun.  *Id.*  The Court notes that, to observe the movement as described Defendant has provided a magnified view of the dashcam video as *doc. 17*, Ex. G.  The Court, however, had more success observing this important moment by viewing the standard video on a widescreen monitor and expanding the viewing window to maximum.

[40]   In his affidavit, Plaintiff indicates that he partially disputes this fact.  *Doc. 28*, Ex. A at 16, ¶ 67.  He again claims that he was not holding a gun, but a breathalyzer.  *Id.*  He does not dispute that Officer Scott aimed at his outstretched arm.  *Id.*  In fact, he states that he was shot in his right hand at this time.  *Id.*

64.   The shot went through the rear window of the Chevrolet, shattering the glass and making it impossible to see the interior of the vehicle through the rear window any longer. *See id.*, Ex. E at 5, ¶ 32.  This shot hit Plaintiff in the right hand.  *Doc. 28*, Ex. A at 16, ¶ 67.

65.   At this point, Defendant stepped out from behind the open door of his patrol car and moved towards the mailbox that was situated on the curb just a few feet ahead, and to the left of his patrol car.[41]  *See doc. 17*, Ex. B at ¶ 68.

66.   From this position, Defendant had a better view through the driver's side window of the Chevrolet, and he could see that Plaintiff appeared to be fiddling with something in his lap.[42]  *See id.*, Ex. B at ¶¶ 68-69.

67.  Defendant fired three (3) more rounds at the driver's side of the vehicle.[43]  *Id.*, ¶ 69; *id.*, Ex. E at ¶ 33; see also, *id.*, Exs. A and D from 09:50:14 - 09:50:17 (recording three additional rounds being discharged at the driver's side of the Chevrolet).

68.  When the daycare teachers and their children heard Defendant fire at Plaintiff's vehicle, they stopped asking questions directed to EMS paramedic supervisor

---

[41]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 69.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[42]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 70.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id*.  He simply claims that the item with which he was fiddling was the breathalyzer.  *Id*.

[43]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* <u>at ¶ 71.</u>  The only material dispute is his claim that "[a]t this time Scott fired 15 Shots into the car at this time."  *Id*. [sic].  However, the dashcam video confirms that only three shots were fired at this time.

Matthew Moon and ran off in the direction from which they had come.[44]  *See id.*, Ex. F at

¶¶ 10-11.

69.  An FPD patrol car that had approached the scene from the west

approximately 20 seconds earlier and stopped just ahead of the EMS ambulance center

on Animas Street quickly backed up and turned around to head back in the direction

from which it came once Defendant began discharging his firearm.[45] *See id.*, Ex. A at

09:50:29 - 09:50:54.

70.  Matthew Moon radioed the SJRMC and advised them to go into lockdown

because FPD was engaged in a shooting nearby.[46]  *Id.*, Ex. F at ¶ 12.

71.  Defendant called out to Plaintiff again, ordering him to "Drop it [the gun],"

but Plaintiff did not comply.  Loud music continued to emanate from the Chevrolet and

the center and side brake lights continued to illuminate and then go out.[47]  *See id.*, Ex. A

at 09:50:30 - 09:50:43.

---

[44]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 72.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[45]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 73.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[46]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶74.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[47]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 75.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

72. Defendant called Officer Nielsen to get over by him and advised him that Plaintiff was lying down in the driver's seat.  *Id.*, Ex. A at 09:50:46 - 09:50:51.

73. Then, Defendant radioed dispatch to get the paramedics away from the [EMS] vehicle that was parked outside the EMS ambulance center and to have them move behind the building.[48]  *See id.*, Ex. A at 09:50:56 - 09:50:57.

74. Two seconds later, the rear brake lights of the Chevrolet went out and the vehicle's white back up lights illuminated, indicating that Plaintiff was placing the Chevrolet in reverse.[49]  *Id.*, Ex. A at 09:50:09; *id.*, Ex. B at 10, ¶ 72.

75. Plaintiff drove the Chevrolet straight back a few feet, causing the right rear tire to come in contact with the back stop stick.  Then, he pulled the vehicle forward over the other stop stick and sharply to the left, bringing it up over the curb and plowing it through a chain-link fence and into the yard of 631 Animas.  *Id.*, Exs. A and D at 09:51:01 - 09:51:05; *id.*, Ex. C at ¶ 35; *id.*, Ex. F at ¶ 14.

76. Defendant knew that FPD had not yet radioed to confirm that traffic had been blocked from entering the area, he also knew that there were vulnerable populations in the area such as schools, a nursing facility for the elderly, and medical

---

[48] In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 77.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

[49] In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 78.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*  Moreover, this fact is clearly established by the dashcam video.

support facilities and that FPD could not have secured these facilities yet.[50] *See id.*, Ex. B ¶ 77.

77.   At this point, Defendant was confronted with the prospect that an armed individual, who had just committed the felony offense of aggravated assault on a police officer and who was driving recklessly, demolishing barriers that lay in his path, would be fleeing into a neighborhood that housed a number of populations that could be out on the sidewalks or traveling on the streets at this time of the morning.[51]  *Id*. at ¶ 79.

78.   Defendant fired two rounds at the Chevrolet as it jumped the curb and turned left towards the fenced yard of the house at 631 Animas.  However, the Chevrolet continued to move through the remnants of the chain-link fence, striking a small tree, which prompted Defendant to fire two more rounds at the vehicle.[52]  *See id.*, Exs. A and D at 09:51:04 - 09:51:06; *id.*, Ex. F at ¶ 14.

79.   The Chevrolet plunged down into the yard at 631 Animas and the white back up lights of the vehicle illuminated, which indicated that Plaintiff was actively switching gears and attempting to reverse course or gain traction by rocking the vehicle

---

[50]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 80.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[51]   In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 81.  However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id.*

[52]   In his affidavit, Plaintiff indicates that he disputes some of the numbers of rounds fired at certain points.  *Id.* at 19, ¶ 83.  However, his numbers generally match those described above but he simply divides the timeline differently.  *Id.*  In any event, the dashcam video clearly establishes the number and timing of the shots that were fired.  And the timeline

from forward into reverse and back. *See id.*, Ex. D at 09:51:07 - 09:51:12; *id.*, Ex. B at ¶¶ 83-84.

80.   Although the Chevrolet appeared to be stuck on something, Plaintiff continued to try to get it to move forward, revving the engine and spinning the wheels in an attempt to gain traction.  *See id*, Ex. D at 09:51:07 (showing dirt being kicked up from base of Chevrolet as engine of vehicle revs).

81.   Defendant fired two (2) more rounds at the side of the vehicle, but to no avail as Plaintiff continued to rev the engine of the Chevrolet.  *Id*. at 09:51:13 - 09:51:15.

82.   As he was firing, Defendant had been moving across the yard of 631 Animas to approach the Chevrolet from the driver's side as he fired. *See id*, Ex. A at 09:51:11-09:51:18 (showing Defendant from the back, moving into the yard of 631 Animas and across the downed fence, with his rifle trained on the Chevrolet); *id*, Ex. B at ¶ 85. Although he had a view into the driver's side window, Defendant could not see Plaintiff at this point.  *Id.*, Ex. B at ¶ 85.  This told Defendant that Plaintiff was most likely lying low in the driver's seat to evade detection as he attempted to accelerate the vehicle to get it free of whatever obstacles were preventing it from moving forward.  *Id.*, Ex. B at ¶ 86.

---

described above matches the video.

83.  Then, the white back up lights of the Chevrolet illuminated once again, indicating that Plaintiff was still attempting to get the vehicle moving.  *See id.*, Ex. A at 09:51:15 - 09:51:16; *id*, Ex. E at ¶ 39.

84.  It was evident that the Chevrolet was by no means disabled yet, despite the stop sticks and the ammunition that had been fired at the vehicle, and thus, Defendant knew that if Plaintiff were to manage to extricate the vehicle, Plaintiff could travel some distance even if the right rear tire was deflated down to its rim.[53]  *Id*. at ¶ 87.

85.  Defendant fired two more rounds at the vehicle at this point, and ordered Plaintiff to "Drop it [the gun]."[54]  *See id*, Exs. A and D at 09:51:15.

86.  Plaintiff opened the passenger-side door of the vehicle and began to wail. *See id.*, Exs. A and D at 09:51:17 - 09: 51:20.

87.  Officer Nielsen approached the Chevrolet from the passenger side and as he moved in closer, he could see that Plaintiff did not have a firearm in his hands.  *See id.*, Ex. E at ¶ 41.

88.  Once Officer Nielsen had Plaintiff handcuffed, he retrieved a handgun, which was lying on or near the center console of the vehicle.  *Id.*, Ex. E at ¶ 44.

89. When Officer Nielsen retrieved the handgun, he saw that it contained a

---

[53]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 90.   However, upon review of the purported dispute, the fact as described here is not disputed in any material fashion.  *Id*.

[54]  In his affidavit, Plaintiff indicates that he disputes this fact.  *Id.* at ¶ 91.  However, upon review of the purported dispute, the fact as described here is not disputed in any material

loaded magazine, but no rounds were in the chamber of the gun.  *Id*., Ex. E at ¶ 46.

## II.   STANDARDS APPLICABLE TO QUALIFIED IMMUNITY MOTION

### A.   Qualified Immunity

When, in a motion for summary judgment, a defendant asserts a defense of qualified immunity, the burden of persuasion shifts from the defendant to the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  For a plaintiff to prevail against a defendant who asserts a defense of qualified immunity in a motion for summary judgment, a plaintiff must show that: (1) "The defendant's actions violated a constitutional or statutory right," and (2) "the right at issue was clearly established at the time of the defendant's unlawful conduct."   *Id*. (internal quotation and citation omitted).  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted).

### B.   Reasonableness and Excessive Force under the Fourth Amendment

In the instant case, Plaintiff claims that his constitutional rights under the Fourth Amendment have been violated by the officer's conduct.  The Fourth Amendment provides that "[t]he right of the people to be secure . . .  in their Persons . . .  against unreasonable . . . seizures . . .  shall not be violated."  U.S. Const. amend. IV.  "[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest,

---

fashion.  *Id*.  Plaintiff does not dispute that Defendant gave this command.

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386,

395 (1989). "The 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene." *Id.* at 396. Further, "[r]easonableness

is evaluated under a totality of the circumstances approach which requires that we

consider the following factors: the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officer or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Wiegel v. Broad*, 544

F.3d 1143, 1151-52 (10th Cir. 2008).[55] "Whether an officer's actions are objectively

reasonable in light of stipulated facts 'is a pure question of law.'" *Cavanaugh v. Woods*

*Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) (quoting *Scott*, 550 U.S. at 381, n.8).

III.   ANALYSIS OF FIRST FOUR SHOTS

        This incident is most clearly viewed as two volleys of shots from Defendant.

First, there were the four shots while Plaintiff's vehicle remained parked on the street.

After these shots, there was a notable break and then Plaintiff attempted to drive off.

While Plaintiff's vehicle was moving or attempting to move, Defendant fired another

eight shots. Each volley must be analyzed separately to determine whether there was a

---

[55] One consideration in the reasonableness analysis of a seizure for the purposes of an excessive force claim is "whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Cordova*, 569 F.3d at 1188 (quoting *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001)). Plaintiff has not argued that such occurred and the Court's review of the record does not reveal any such conduct.

seizure, and, if so, was it reasonable.  *See Cordova*, 569 F.3d at 1187 (separating analysis of shots based upon danger to officer at moment of specific firing).

With respect to the first volley of four shots, the first question is whether there was a seizure.  Defendant argues that, because this volley did not terminate Plaintiff's movement, no seizure occurred.  *Doc. 17* at 26-28.  The Tenth Circuit has made clear that, even when deadly force is used, "termination of movement or acquisition of physical control in flight situations" is necessary for a seizure to occur.  *Brooks v. Gaenzle*, 614 F.3d 1213, 1219-25 (10th Cir. 2010).  In the instant case, it is apparent that the first four shots did not terminate Plaintiff's movement or allow the officer to immediately acquire physical control.  In fact, it was only after those shots that Plaintiff began to move his vehicle.  Therefore, I find that the first volley of four shots did not constitute a seizure under the Fourth Amendment.

However, the Court recognizes that the determination of whether there was a seizure under these facts is a close one.  In *Brooks*, the individual who had been shot managed to climb a fence and elude arrest for three days.  *Id*. at 1124.  In contrast, Plaintiff only managed to drive his vehicle approximately fifteen feet and was apprehended minutes later.  Moreover, Plaintiff's movement was quickly terminated by further application of the same instrumentality – Defendant's firearm – as was used for that first volley.  *Id*. at 1223 (distinguishing case from another where the Seventh Circuit reached opposite result because in the Seventh Circuit case the individual was "stopped

by the very instrumentality set in motion . . . to achieve that result[]"). Consequently, the Court will, in the alternative, analyze the first volley as if it was a seizure.

As laid out above, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 387. Moreover, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97. A number of undisputed facts demonstrate that the first volley of shots was reasonable in the instant case.

First, Defendant reasonably believed that Plaintiff possessed a firearm. Before any shots were fired, Defendant repeatedly made statements to both Plaintiff and other officers indicating this belief. *See supra* at ¶¶ 6, 28, 37, 42, 47. This belief was objectively reasonable. He had been told that EMS personnel had observed a firearm in Plaintiff's lap. *See supra* at ¶ 6. In fact, EMS personnel were so concerned that they called for the welfare check and then took up a position away from Plaintiff's vehicle and attempted to block traffic from approaching it. *See supra* at ¶¶, 2, 14.

Second, Defendant reasonably believed that Plaintiff was not acting rationally. Defendant was called to the scene because Plaintiff had been sitting unconscious in a vehicle while holding a firearm. When Defendant began to personally interact with

Plaintiff, Plaintiff apparently[56] failed to follow Defendant's clear instructions which were repeatedly numerous times.  The brake lights on the vehicle repeatedly flashed which a reasonable officer could interpret as indicating that the driver was considering starting the vehicle or putting it into gear.  *See supra* at ¶¶ 21, 27, 31, 33, 34, 39, 41, 44, 58.

Third, just when Officer Nielsen moved from the protection of the police vehicle and up to Plaintiff's car to place a second stop stick, Defendant made a sudden move. *See supra* at ¶ 62.  Plaintiff appeared to lift his outstretched right arm from the passenger seat area and turn his body such that his head was looking back out the rear window of the Chevrolet and his right hand moved over the passenger seat into the area above the back seat.  It appeared that Plaintiff was holding something approximately the size of a gun which, if it were a gun, would now be pointing towards the rear passenger side of the vehicle.  *Id.*

Given Defendant's reasonable belief that Plaintiff possessed a firearm and his erratic behavior up to that point, he was reasonable in believing that Plaintiff was pointing a firearm at Officer Nielsen.  There can be little debate that if an officer observes someone pointing a firearm at another officer, the use of deadly force is

---

[56]  As discussed above, Plaintiff claims that he did put both hands out the window in response to Defendant's commands.  However, the dashcam recording shows that (1) on the occasions that Plaintiff put any hand out the window, it appeared to be only one of his hands; and (2) Plaintiff never kept even one of his hands out the window for any length of time, but would pull his hand(s) back into the car soon after putting it/them out.  This dispute is not material because the analysis of reasonableness is from the perspective of a reasonable officer on the scene.  A review of the dashcam recording makes it clear that a reasonable officer at the scene would have believed that Plaintiff had not complied with the instructions.  Plaintiff

justified.  Therefore, Defendant was reasonable in firing that first shot at Plaintiff.[57]

Immediately after this first shot, Defendant could no longer see inside the vehicle through the rear window.  *See supra* at ¶ 64.  Because he reasonably determined that he needed to see what was happening inside Plaintiff's vehicle, Defendant moved out from behind the door of his patrol car to a position from which he could see in through the side of Plaintiff's vehicle.  *See supra* at ¶¶ 65-66.  At this time, Defendant observed Plaintiff with his hand in his lap fiddling with something.[58]  *See supra* at ¶ 66.  Given that (1) Defendant reasonably believed that Plaintiff had just pointed a firearm at an officer, (2) Defendant had just fired a shot at Plaintiff, but (3) Plaintiff was not demonstrating surrender in any fashion – it was reasonable for Defendant to believe that Plaintiff was fiddling with the firearm with the intent to use it further.  Defendant, who was now in a less protected position, was therefore reasonable in firing the next three rounds at the driver's side of the vehicle.

Consequently, assuming the first volley of four shots was a seizure, this Court holds that the use of that force was reasonable and not a constitutional violation.

IV.   ANALYSIS OF LAST EIGHT SHOTS

After the first four shots are fired, approximately 43 seconds pass during which

---

concedes as much.  *See doc.* 28 at 7-8.
    [57]   In fact, as can be seen in the dashcam recording, the first shot was aimed precisely at the hand which appeared to hold the firearm.  This conclusion is also supported by the fact that the first shot hit Plaintiff's right hand.  *See supra* at 19,  ¶ 68.
    [58]   *See supra* n.44.

Plaintiff does not show his hands or otherwise indicate surrender. *See supra* at ¶¶ 67,

78. *See also doc. 17*, Ex. A at 9:50:17 – 9:51:00. He then puts the vehicle into reverse,

backs up a few feet, drives over a stop stick, puts the vehicle into a forward gear, drives

back over the stop stick, turns the vehicle sharply to the left, drives over the curb into

the yard of 631 Animas and plows it thorough a chain-link fence. *See supra* at ¶¶ 74-75.

The vehicle becomes stuck on the fence but Plaintiff continues to rev the engine and

switch gears in an apparent attempt to break free of the obstacle. *See supra* at ¶ 80. At

the moment, the vehicle first drives over the curb, Defendant begins the second volley

of shots. *See supra* at ¶ 78. In the next thirteen seconds, Defendant fires eight more

rounds in this second volley. *See supra* at ¶¶ 78, 81, 85. Eventually, these shots force

Plaintiff to exit the vehicle and he is taken into custody. *See supra* at ¶ 86.

Unlike the first volley which was in immediate response to a firearm apparently

being pointed at an officer, this second volley was in response to Plaintiff's attempted

flight from the scene. Consequently, the court must review the caselaw pertaining to

the use of deadly force to end flight by a suspect.

The Supreme Court has made clear that a "police officer's attempt to terminate a

dangerous high-speed car chase that threatens the lives of innocent bystanders does not

violate the Fourth Amendment, even when it places the fleeing motorist at risk of

serious injury or death." *Scott*, 550 U.S. at 385-86. In *Scott*, after a high speed chase

which placed other motorists in imminent danger, the officer "applied his push bumper

to the rear of the respondent's vehicle.  As a result, respondent lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed. Respondent was badly injured and was rendered a quadriplegic." *Id*. at 375.  On these facts, the Supreme Court held that the officer's use of force was reasonable as a matter of law and no constitutional violation had occurred. *Id*. at 386.

In *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), the Tenth Circuit addressed the implications of *Scott* under slightly different facts.  In *Cordova*, an officer attempted to pull over a driver who was driving a truck that was pulling a piece of heavy excavation equipment. *Id.* at 1186.  Instead of stopping, the driver drove through a red light and tried to evade police. *Id.*  When officers cornered the driver in a parking lot, the driver escaped by attempting to ram the police officers' cars. *Id*. During the chase that ensued, the driver continued to evade police vehicles by swerving off the road to avoid stop sticks, by again running a red light, by again attempting to ram police vehicles, and by taking the chase down a highway in the direction contrary to the flow of traffic. *Id.*  At the conclusion of the chase, the driver aimed his truck at a police officer who fired at the driver. *Id.* After the driver passed the officer and the officer was no longer in danger, the officer continued to fire at the truck. *Id.*  One of the final shots, fired after the officer was no longer in danger because the truck had passed him and was moving on, hit the driver in the back of the head and killed him. *Id.* at 1187.  The driver's estate sued on a claim of excessive force. *Id.* at 1187.

The Tenth Circuit began by noting that there "is no easy-to-apply legal test for whether an officer's deadly force is excessive; instead, we must slosh our way through the fact-bound morass of reasonableness." *Id*. at 1188 (internal citations and quotations omitted). The Court of course noted the relevance of the *Weigel* factors listed above. *Id*. Then the Court addressed whether *Scott* controlled and dictated a finding that the officers had committed no Fourth Amendment violation. The Court found that two important distinctions between the facts in *Scott* and the facts in *Cordova* should lead to different results.

First, the court noted that the difference between the means used by the police to end the chase in the two cases. In *Scott*, the officers used their vehicles to bump the vehicle of the fleeing individual. *Scott*, 550 U.S. at 375. In *Cordova*, the officers shot the fleeing individual in the head. *Cordova*, 569 F.3d at 1187. As the court explained:

> [W]hile the threat to the suspect in *Scott* posed a "high likelihood" of serious injury or death, it did "not [pose] the near *certainty* of death posed by, say shooting a fleeing felon in the back of the head, or pulling alongside a fleeing motorist and shooting the motorist." A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person . . . .
>
> When discussing excessive force, we sometimes use the term "deadly force" as if it is a unitary concept. . . . As *Scott* makes clear, however, the term encompasses a range of applications of force, some more certain to cause death than others. It includes force that is "likely" to cause serious injury or death, such as ramming, and also includes force that is nearly certain to cause death, such as a shot to the head. *Scott* strongly suggests that the reasonableness balancing must take into account that there is a spectrum of "deadly force," and that just because a situation justifies ramming does not mean it will justify shooting a suspect in the head.

*Id.* at 1189 (emphasis in original) (internal citations omitted).

Next, the Court in *Cordova* distinguished the imminence of risk to third parties between the two cases.  The Court noted that, in *Scott*, the facts indicated that other motorists were in the immediate vicinity of the fleeing motorists.  *Id.* at 1189 (*citing Scott*, 550 U.S. at 379 (describing how the suspect "swerve[d] around more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective shoulders to avoid being hit.")).  In contrast, in *Cordova*, "there were no other motorists in the immediate vicinity."  *Id*.  Moreover, the Court concluded that a jury could find that the officers themselves were not in imminent risk at the time the fatal shot was fired.  Id. at 1191 ("[T]he undisputed fact that at least some of the shots hit the truck from the side, showing that the truck was no longer bearing down on [the officer], and the testimony of a Commerce City police officer that 'one trained in the use of that pistol in tactical shoot/no shoot scenarios would have no difficulty ceasing firing when the danger ceased,' suggest that a reasonable jury could disagree . . . that [the police officer] was indisputably in immediate danger *when he fired the fatal shot*.").

As a result of these two differences with the facts in *Scott*, the *Cordova* court determined that the trial court erred in finding as a matter of law that the officer's use of deadly force had been reasonable.  *Cordova*, 569 F.3d at 1192.

Like in *Cordova*, because Defendant fired eight rounds from his weapon into the vehicle occupied by Plaintiff, Defendant used an amount of force more likely to cause death than the force used in *Scott*.  Therefore, *Cordova* directs that the Court closely examine the imminence and degree of risk posed by Plaintiff's flight.  A review of the undisputed facts clearly demonstrates that the risk was great indeed.

First, unlike *Cordova*, the record firmly establishes that there were other motorists in the immediate vicinity.  The dashcam recording establishes that the incident was occurring a block away from a well-traveled road.  *See doc. 17*, Ex. A at 9:43:35-9:45:36 (In the two minutes shown on the videotape during which Defendant was driving on that road, more than 60 vehicles are seen driving on road one block away.)  During the initial two and a half minutes of the interaction with Plaintiff, the dashcam records five different vehicles passing through the intersection right in front of Plaintiff's vehicle.  *Doc. 17*, Ex. A at 9:46:00 – 9:48:30.  Despite Defendant's repeated radio requests for traffic into that intersection to be blocked, only ten seconds before the first shot is fired, another vehicle goes through that intersection.  *Id.* at 9:50:00.

Second, in addition to other motorists in the immediate vicinity, the undisputed facts establish that there were pedestrians in this residential area, including a day care group which was only a block away just thirty seconds before the first shot was fired.  *See supra* <u>at 16, ¶ 59; *see also doc. 17*, Ex. I (a map of the area in which the incident occurred).</u>  Moreover, Defendant was aware of other vulnerable populations in the

immediate vicinity and knew "how risky it would be to pursue an individual in [such] an area[]." *Doc. 17*, Ex. A at 6-7.

Third, unlike in *Cordova*, Plaintiff was apparently (a) in possession of a firearm and (b) willing to use it against others, (c) including individuals he knew to be law enforcement officers. Such an individual can undoubtedly be called armed and dangerous. EMS' concern about Plaintiff's condition which led to Defendant being called to the scene coupled with Plaintiff's erratic behavior prior to any shots being fired made Plaintiff's apparent possession of a firearm particularly dangerous.

Finally, the *Cordova* court took pains to note that a:

> threat to the officers themselves – if actual and imminent – could of course shift the calculus in the direction of reasonableness. If a reasonable officer in Officer Aragon's position would have feared for his life or the life of his fellow officers, then on one side of the scales would sit not only the potential (even if distant) risk to any motorist who might wander along, but also the very immediate risk of death to the pursuing officers. The urgency of terminating the chase would increase and the balance would tip in the officers' favor. The use of deadly force—even of the level nearly certain to cause death—would likely be justified.

*Id.* at 1190. In the instant case, Plaintiff had apparently already demonstrated a willingness to point a firearm at a law enforcement officer who was attempting to prevent him from leaving. Consequently, allowing Plaintiff to depart the scene would lead to "the very immediate risk of death to pursuing officers." *Id*.

As *Cordova* states, there "is no easy-to-apply legal test for whether an officer's deadly force is excessive; instead we must slosh our way through the fact-bound

morass of reasonableness." *Id.* at 1188 (internal citations and quotations omitted). Sloshing through the facts in the instant case particularly when comparing them to those in *Cordova*, this Court holds that firing the second volley of shots was reasonable as a matter of law and not a constitutional violation.

## IV.   CONCLUSION

Herein, the Court has determined the relevant set of facts and drawn all inferences in favor of the Plaintiff to the extent supportable by the record.  Under those facts and inferences, the Court finds that the first volley of shots did not constitute a seizure.  The Court further finds that, even if the first volley of shots did constitute a seizure, those shots were reasonable under the circumstances given the immediate threat posed to the officers.  The court further finds that the second volley of shots were also reasonable under the circumstances given the imminent threat posed to third parties in the immediate vicinity and pursuing officers had Plaintiff been permitted to flee.  Therefore, Defendant committed no constitutional violation and the Court will grant Defendant's motion for qualified immunity.

The Court hereby GRANTS Defendant's Motion for Partial Summary Judgment and dismisses Plaintiff's individual capacity claim for excessive force.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent